742 S.E.2d 677

**Charles A. HAWKINS, Appellant,**

v.

**Angela D. HAWKINS, Respondent.**

**Appellate Case No. 2011–195506.**

**No. 5116.**

Court of Appeals of South Carolina.

Heard Feb. 5, 2013.

Decided April 17, 2013.

Donald Bruce Clark, of Charleston, and Sabrina R. Grogan, of Mount Pleasant, for Appellant.

J. Mark Taylor, of Moore Taylor & Thomas, PA, of West Columbia, Katherine Carruth Goode, of Winnsboro, and Sally Anna King–Gilreath, of Mount Pleasant, all for Respondent.

LOCKEMY, J.

Charles A. Hawkins (Father) appeals the family court's determination that he was not entitled to a termination or reduction of his child support payments. Specifically, he argues the family court erred by using an improper burden of proof; or in the alternative, the family court erred in its failure to properly recalculate his child support payments. Lastly, Father contends the family court erred in awarding Angela D. Hawkins (Mother) attorney's fees, but failing to award his attorney's fees. We affirm.

**FACTS**

Father and Mother were divorced by a final decree on February 3, 2004. Prior to the divorce, the family court approved a property settlement and support agreement (Settlement Agreement) which had been entered by the parties. Pursuant to that order, the parties were awarded joint custody of their two minor children with Mother having primary custody. Father was required to pay child support in the amount of $1,300.00 per month, pursuant to the Department of Social Services Child Support Guidelines (Child Support Guidelines). The order further provided that the amount of child support would be revisited on an annual basis:

The [Father] shall pay, pursuant to the [Child Support Guidelines], as for the child support the sum of $1,300.00

234

Dollars per month, due the first of each month, said sum to be paid directly to the [Mother]; that should the payment ever be more than five (5) days late, the [Mother] may present her Affidavit to the Court and all future payments shall be made thereafter through the Charleston County Family Court, together with the 3% administrative fee. For the period of time until the marital home is sold and a closing has taken place, the [Father] has agreed to pay the mortgage, taxes and insurance on the marital home, water, home repair bills, the rent on the apartment and the power and utility bills for both the apartment and marital home. The [Father] further agrees to pay the automobile payments, automobile insurance coverages and gas for both cars. The cost of carrying these expenses will constitute child support during this period of time. At such time as the marital home is sold, the parties agree to calculate child support based on the shared [Child Support Guidelines]. Based on the gross income of each party at this time and the amount of parenting time of both party, the calculated child support is $1,300.00. This payment of child support shall begin the first month following the closing from the sale of the marital home. The parties agree to recalculate child support when the [Mother] begins full-time work, which is expected to be no later than September 2005. Child support will be revisited on an annual basis thereafter.

Around three years later, on May 22, 2006, the parties filed a consent order, noting a change in their respective incomes, and they recalculated Father's child support obligation pursuant to the Child Support Guidelines. That order provided in pertinent part:

The parties have experienced changes in their respective incomes such that a modification of child support is now warranted. Based upon the parties' respective current incomes, the Plaintiff presently earns $11,500.00 per month and the Defendant presently earns $2,750.00 per month (see attached as Exhibit C, the financial declarations of the parties), and pursuant to the [Child Support Guidelines] (a copy of which is attached hereto as Exhibit D), the Plaintiff's monthly child support obligation should be set at $1,077.00. The parties have therefore, based upon the foregoing, agreed to a modification of the Plaintiff's child

support obligation, such that said obligation shall be reduced from $1,300.00 per month to $1,077.00 per month.

On October 8, 2007, a second consent order was entered, noting another change in the parties' respective incomes, as well as the fact Father would begin having 156 overnights per year with the children. The parties recalculated Father's child support obligation pursuant to the Child Support Guidelines. The second consent order provided in pertinent part:

The parties have experienced changes in their respective incomes such that a modification of child support is now warranted. The parties have therefore, based upon the foregoing, agreed to a modification of the Plaintiff's child support obligation, such that said obligation shall be reduced from $1,077.00 to $800.00 per month beginning September 1, 2007, and shall remain in effect through the end of May 2008, at which time the parties anticipate a substantial change in the Defendant's income, which will at that time warrant a recalculation of child support.

As referenced above, the parties shall in May of 2008 revisit and recalculate child support, and the parties further agree that said calculation shall be based, in part, upon the Plaintiff having 156 overnight visitations with the children, although their custody/visitation arrangement is, in fact, a shared (50/50) schedule, as referenced in Dr. Tyroler's attached as Exhibit D. The parties shall however, continue to comply, through December of 2007, with the visitation which was agreed upon by the parties through Dr. Tyroler.

On January 22, 2009, a third consent order was entered, granting Father 182 overnights per year with the children, and again recalculating Father's child support pursuant to the Child Support Guidelines. This was the fifth time in approximately six years Father's child support had been modified, including the two times an automatic recalculation was required pursuant to the initial Settlement Agreement. At the time of the third consent order, Father's income was stated as $9,833.00 per month and Mother's income was $2,900.00 per month. Father had been terminated from his job as a senior executive sales representative for GlaxoSmithKline. His income was derived from $130,000.00 received from his severance. The third consent order stated in pertinent part:

The parties agree that the Mother shall have the children 183 overnights per year and the Father shall have the children 182 overnights per year. Based upon the various child support guideline figures examined by the parties, they have agreed that the Father shall pay the Mother the sum of $640.00 per month as child support. The parties further agree that the Mother shall have to have a reported income in excess of $43,000[.00] before her income can be the basis for a modification of child support. The foregoing child support was calculated based on the following:

a. The Mother having 183 overnight and $2900[.00] per month income;

b. The Father having 182 overnights and $9833[.00] per month income and paying $150 in health care.

c. The parties have agreed that their current child care expenses have not been included in these support calculations.

On February 16, 2010, Father filed the present action requesting a termination of his child support payments and an award of child support in the amount of $98.00 from Mother. This fourth action was the first action in which Mother did not consent to Father's requested relief. On April 12, 2010, Mother filed her answer and counterclaim denying Father was entitled to a reduction of child support and further requesting attorney's fees and costs. Father filed a reply to Mother's counterclaim, and the trial was held on January 18–19, 2011.

At the time of trial, Father was fifty-one years old and claimed he made $0.00 income. He stated after his termination in 2008, he immediately commenced his job search, and assumed his severance package would support him until he found his next job. GlaxoSmithKline paid for a company to assist Father in finding a job, and the company told Father the odds of finding another pharmaceutical job were low and to anticipate making less money in his next job. Father admitted he did not investigate certain jobs because he spent most of his time searching for one that would provide a six-figure income. He was finally employed with a real estate company, Carolina One, and obtained his real estate license. His income was based on commission, and he claimed he had not yet made any sales or income from his new job.

Father stated his new spouse, a radiologist at a local hospital, financially supported him during his unemployment. Otherwise, he would have used his savings for support, which included an IRA account valued at $596,000.00. Father lived in a home measuring 3,400 square feet with an approximate $7,000.00 monthly mortgage payment. Father claimed he and his spouse had economized due to their decreased income in many ways, including cutting their second telephone landline, ending their TiVo subscription, forgoing yard work such as laying pine straw, and reducing their sprinkler usage. While he was unemployed, he paid costs of $1,250.00 for a KAPLAN course and $1,600.00 for auditing classes to possibly obtain jobs in a certain profession, and he admitted those costs equaled three months of child support. Further, he admitted he, his spouse, and his two children took several vacations during 2009 and 2010 to destinations including the Virgin Islands, Grove Park Inn located in North Carolina, and Park City, Utah. He explained those trips were paid from a continuing education budget his spouse was given, but she no longer received that budget. He also testified he owned a 19-foot Key West boat, a life insurance policy in the amount of $500,000.00, a lot at Pawley's Island, and he further conceded he paid $200.00 a month for a maid to clean their primary home.

Mother was employed as a kindergarten teacher for Berkeley County School District, but during the summer she worked several jobs to maintain her income. She made approximately $48,000.00 a year, which totaled $4,666.24 per month in gross income. Her home was 1,400 square feet with a $1,1158.25 monthly mortgage payment. She testified her assets were valued at a little less than $123,000.00, and that amount consisted of her home, car, IRA's, and money in her checking account. She had not remarried and was the sole wage earner for her household, and she testified if the current level of child support was reduced or terminated, she would not be able to maintain the home and meet the family's other expenses. To meet her current expenses, including attorney's fees, Mother had withdrawn funds from her IRA as needed.

The family court found Father knew of his lack of employment and the economic climate in the country when he signed the third consent order on January 22, 2009. Father had

$532,606.00 in retirement assets, which the family court found he could utilize to pay his child support. The family court noted Father had remarried but did not consider his current spouse's income in its decision. However, the family court held it would be "inequitable . . . to ignore the fact that the Father has not experienced a significant change in lifestyle despite losing his job." Father's spouse paid all of his expenses, and his marital situation has afforded him "the ability to consider his options and begin a new career as a real estate agent where he hopes to again earn the income he had before, rather than taking a significantly lower paying job as a medical technologist." The family court found Father's reduction of income alone was not enough to warrant a modification of child support and ruled he was capable of making his child support payments as evidenced by his continued high standard of living. The family court maintained he failed to show he could no longer make the child support payments required by the third consent order. In conclusion, the family court denied Father's request for a modification or termination of his child support payments and awarded Mother attorney's fees, which totaled $23,477.95.

Father filed a Rule 59(e), SCRCP motion to alter or amend the final order. The family court denied the motion but issued a revised final order, altering the language to conform with the intervening decision of our supreme court in *Miles v. Miles*, 393 S.C. 111, 711 S.E.2d 880 (2011). The family court further awarded Mother additional attorney's fees incurred in connection with the Rule 59(e) motion, which totaled $971.00. Father appealed both the revised final order and the denial of his Rule 59(e) motion.

**STANDARD OF REVIEW**

■■■■■ " 'The family court is a court of equity.' " *Holmes v. Holmes*, 399 S.C. 499, 504, 732 S.E.2d 213, 216 (Ct.App.2012)(quoting *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011)). "In appeals from the family court, the appellate court reviews factual and legal issues de novo." *Id.* (citing *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011)). " 'De novo review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the [family] court's findings.' " *Id.* (quoting *Lewis*, 392 S.C. at 390, 709 S.E.2d at 654–55). "However, this broad

standard of review does not require the appellate court to disregard the factual findings of the family court or ignore the fact that the family court is in the better position to assess the credibility of the witnesses." *Id.* (citing *Pinckney v. Warren,* 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001)). "Moreover, the appellant is not relieved of the burden of demonstrating error in the family court's findings of fact." *Id.* (citing *Pinckney,* 344 S.C. at 387–88, 544 S.E.2d at 623). "Accordingly, we will affirm the decision of the family court in an equity case unless its decision is controlled by some error of law or the appellant satisfies the burden of showing the preponderance of the evidence actually supports contrary factual findings by this court." *Id.*

## LAW/ANALYSIS

### Automatic Annual Recalculations

■ Father argues the Settlement Agreement in 2003 provided child support payments would be recalculated automatically every year pursuant to the Child Support Guidelines, and, thus, Father did not have to establish the traditional standard of an unforeseen, substantial change in circumstances. We disagree.

■ "We encourage litigants in family court to reach extrajudicial agreements on marital issues." *Miles v. Miles,* 393 S.C. 111, 117, 711 S.E.2d 880, 883 (2011).

■■ "The interpretation of such agreements is a matter of contract law." *Id.* (citing *Hardee v. Hardee,* 348 S.C. 84, 91–92, 558 S.E.2d 264, 267 (Ct.App.2001)). "Where an agreement is clear on its face and unambiguous, 'the court's only function is to interpret its lawful meaning and the intent of the parties as found within the agreement.'" *Id.* (quoting *Smith–Cooper v. Cooper,* 344 S.C. 289, 295, 543 S.E.2d 271, 274 (Ct.App.2001)). If "the agreement is silent as to the family court's power to modify it, it remain[s] modifiable by the court." *Id.* at 118, 711 S.E.2d at 883; *see Moseley v. Mosier,* 279 S.C. 348, 353, 306 S.E.2d 624, 627 (1983)("[U]nless the agreement unambiguously denies the court jurisdiction, the terms will be modifiable by the court....").

The Settlement Agreement addressed future annual modifications in child support by stating, "Child support will be revisited on an annual basis thereafter." The parties used the Child Support Guidelines to establish the initial child support payment of $1,300.00, and the Settlement Agreement ordered an automatic recalculation based on two events occurring: (1) the selling of the marital home and (2) Mother obtaining a full-time position. The specific language requiring a recalculation based on the occurrence of two events, followed by the language stating child support will be "revisited" annually, indicates the parties' intent was not to have automatic annual recalculations. While Father argues this interpretation would render the sentence meaningless, we disagree. The sentence simply leaves open the possibility of future recalculations should they be necessary.

Father then asserts that because the Settlement Agreement required automatic recalculations using the Child Support Guidelines for the two events previously mentioned, it implicitly showed the parties' intentions to use the Child Support Guidelines for all future modifications as well, dispensing of the traditional burden of proof. Again, we disagree with his assertion. The parties specifically delineated two events that would require modification pursuant to the Child Support Guidelines, and then left absent any language as to future modifications. They had the opportunity to agree to an automatic yearly calculation according to the Child Support Guidelines, but they did not.

As to Father's burden of proof for a modification, the Settlement Agreement did not mention a change in the required burden of proof for receiving a modification. Father is correct that Mother has previously consented to modifications based upon the Child Support Guidelines; however, the prior consent of Mother does not obligate the family court to now grant Father a modification without any burden of proof when Mother does not consent. The absence of an agreement regarding the burden of proof for future modifications permitted the family court to place the traditional burden of proof upon Father. Thus, we affirm the family court.

## Unforeseen, Substantial Change in Circumstances

Father argues even if the traditional burden of proof applies, he has proven an unforeseen, substantial change in circumstances. We disagree.

"A family court has authority to modify the amount of a child support award upon a showing of a substantial or material change of circumstances." *Miller v. Miller*, 299 S.C. 307, 310, 384 S.E.2d 715, 716 (1989)(citing *Thornton v. Thornton*, 294 S.C. 512, 516, 366 S.E.2d 37, 39 (Ct.App.1988); *Calvert v. Calvert*, 287 S.C. 130, 137, 336 S.E.2d 884, 888 (Ct.App. 1985); S.C.Code Ann. § 20–3–160 (1985)). "The burden is upon the party seeking the change to prove the changes in circumstances warranting a modification." *Id.; see Garris v. Cook*, 278 S.C. 622, 623, 300 S.E.2d 483, 483–84 (1983) (failure to prove changed circumstances supports the denial of request for increased support).

"A substantial or material change in circumstances might result from changes in the needs of the children or the financial abilities of the supporting parent to pay among other reasons." *Miller*, 299 S.C. at 310, 384 S.E.2d at 717 (citing *Smith v. Smith*, 275 S.C. 494, 497, 272 S.E.2d 797, 798 (1980)). "Generally, however, changes in circumstances within the contemplation of the parties at the time the initial decree was entered do not provide a basis for modifying a child support award." *Id.* (citing *Calvert*, 287 S.C. at 139, 336 S.E.2d at 889; *Nelson v. Merritt*, 281 S.C. 126, 130, 314 S.E.2d 840, 842 (Ct.App.1984)).

Father admitted he was terminated from his employment before he signed the third consent order, and thus, he was aware of the potential to remain unemployed. Prior to signing the third consent order, he was told it would be difficult to find a job in his former pharmaceutical field, and he should expect a decreased income with any future employment. Further, Father has since obtained employment with Carolina One, and while it is a commission based position, he has the potential to make an income. We believe his claimed current economic situation was within contemplation when the third consent order was executed. However, even if it was not within the parties' contemplation, Father has not proven a

material and substantial change of circumstances warranting a reduction in alimony.

"The mere fact that a supporting spouse's salary or income has been reduced does not of itself require a reduction of ... child support." *Calvert*, 287 S.C. at 138, 336 S.E.2d at 888–89. " 'Whether termed voluntary underemployment, imputation of income, or the failure to reach earning potential, the case law is clear that when a payor spouse seeks to reduce support obligations based on his diminished income, a court should consider the payor spouse's earning capacity.' " *Marchant v. Marchant*, 390 S.C. 1, 9, 699 S.E.2d 708, 712–13 (Ct.App.2010)(quoting *Gartside v. Gartside*, 383 S.C. 35, 44, 677 S.E.2d 621, 626 (Ct.App.2009)). "Likewise, it is proper to consider a supported spouse's earning capacity and impute income to a spouse who is underemployed or unemployed." *Id.* at 9, 699 S.E.2d at 713; *see Patel v. Patel*, 359 S.C. 515, 532, 599 S.E.2d 114, 123 (2004) (affirming the family court imputing minimum wage income to wife, who had been out of the workforce for twenty years but was capable and energetic). " 'However, courts are reluctant to invade a party's freedom to pursue the employment path of their own choosing or impose unreasonable demands upon parties.' " *Marchant*, 390 S.C. at 10, 699 S.E.2d at 713 (quoting *Kelley v. Kelley*, 324 S.C. 481, 489, 477 S.E.2d 727, 731 (Ct.App.1996)). " 'Nonetheless, even otherwise unreviewable career choices are at times outweighed by countervailing considerations, particularly child support obligations.' " *Id.* (quoting *Kelley*, 324 S.C. at 489, 477 S.E.2d at 731).

In *Bennett v. Rector*, the family court granted a father's request to receive child support payments from the noncustodial mother, despite mother's claim she made only $2,000.00 a month. 389 S.C. 274, 279–80, 697 S.E.2d 715, 718 (Ct.App.2010). The family court found the mother not credible and imputed income to mother based on her testimony that she has the ability to earn and believes she will earn between $149,000.00 and $252,000.00 a year. *Id.* On appeal, this court determined the family court is allowed to take into account the mother's access to a large amount of money judging from her monthly expenses, expensive properties, savings accounts, and shopping habits. *Id.* at 283, 697 S.E.2d at 720. The court stated "[a]llowing [the mother] to receive

the benefit of such an extravagant lifestyle while only paying child support based on income of $23,000[.00] a year would be inequitable." *Id.*

In *Kielar v. Kielar*, this court reversed the family court's decision to modify the divorce decree and award child support to the custodial father. 311 S.C. 466, 469, 429 S.E.2d 851, 853 (Ct.App.1993). The father argued his involuntary resignation from a hospital which resulted in a reduced income along with the increase in the mother's earned income was a sufficient change of circumstances to warrant modifying the alimony and child support provisions of the divorce decree. *Id.* This court found that under the specific facts of the case, father's reduced income was not a material change of circumstances warranting modification because his income was still enough that he was able to pay alimony and support his children without reducing the standard of living he enjoyed during his prior marriage. *Id.* "In contrast, [the mother's] standard of living, although quite comfortable, is less than it was during the marriage. If she were required to pay child support, it would be diminished even more." *Id.* The court recognized that since the divorce, the father found it "difficult to maintain his accustomed lifestyle, meet his alimony and child support obligations, and pay [the mother] her share of the equitable distribution." *Id.* However, the father's reduced net worth resulted primarily from the equitable distribution of the marital estate consequent on the divorce, not a changed circumstance unconnected with the divorce or not contemplated by the divorce decree. *Id.* at 469–70, 429 S.E.2d at 853. We noted "the normal consequence of divorce is a straitened financial situation for one or both parties ... [but] [w]ithin the scope of their authority, ... the courts must achieve, as nearly as practical, equity between the parties." *Id.* at 470, 429 S.E.2d at 853. We found it would be neither "consistent with the law nor consonant with equity to burden [the mother] with a child support payment to [the father], whose earned income and assets are several multiples of hers, when he has the ability to support the children fully from his own resources without reducing the standard of living he enjoyed during the marriage." *Id.* at 470, 429 S.E.2d at 853–54.

Father's lifestyle is reminiscent of the mother in *Rector*. He continues to take high-end vacations, lives in a large home

that requires $7,000.00 monthly mortgage payments, owns a property with his spouse on Pawley's Island, and owns a 19–foot boat. Moreover, he has an IRA account containing an estimated $500,000.00. While he says he and his spouse have "economized," his economizing included cutting a second telephone line, ending their TiVo subscription, and reducing their sprinkler usage. Father admitted he did not devote much time looking for jobs that would not yield a six-figure salary and also did not give much interest to jobs outside of the pharmaceutical field. In comparison to Father, Mother has not remarried and lives in a 1,300 square foot home with an estimated $1,300.00 monthly mortgage payment. She works as a kindergarten teacher for the public school system, and during the summer, she worked several jobs to sustain her income. We do not see a huge change in Father's standard of living, especially when comparing it to Mother's standard of living. As in *Kielar*, it would be inequitable to allow Father to claim a $0 income and base a termination of child support payments on that income. We further note Father has taken a job with Carolina One as a real estate agent, with the potential to begin making an income. We find the preponderance of the evidence supports the family court's decision; thus, we affirm its decision.

## Father's IRA Account

Father contends the family court erred in considering funds in his IRA account as income for purposes of computing child support, and further erred in implicitly considering Father's wife's income. We disagree.

Here, the family court mentioned the IRA account, "which he [could] utilize to pay his child support." The family court did not require Father to pay child support from his IRA account, and we view the order as merely noting another one of Father's assets in comparison to Mother's assets in determining whether he was able to pay the child support from his own resources. *See Kielar*, 311 S.C. at 468, 429 S.E.2d at 852 (noting the father's two retirement accounts along with other assets and then concluding he had the ability to support the children fully from his own resources without reducing the standard of living he enjoyed during the marriage). Accordingly, we find the court did not err in considering Father's

IRA account in determining whether to modify Father's child support payments.

As to Father's spouse's income, the family court had the discretion to consider the income of Father's new spouse in determining whether a substantial or material change of circumstances had occurred that warranted a reduction in his child support. *See Fischbach v. Tuttle,* 302 S.C. 555, 557, 397 S.E.2d 773, 774 (Ct.App.1990). In the present case, the family court was given a sealed envelope containing Father's new spouse's salary; however, the family court never opened it, and made its determination without considering the exact salary she may have made. It appears the family court properly considered it as an additional source of income for Father's household when determining whether he presented evidence sufficient to show a substantial or material change of circumstances warranting a reduction in his child support.

### Attorney's Fees

Father argues the family court erred in awarding Mother attorney's fees. We disagree.

"Before awarding attorney's fees, the [f]amily [c]ourt should consider: (1) each party's ability to pay his or her own fee; (2) the beneficial results obtained by the attorney; (3) the parties' respective financial conditions; and (4) the effect of the attorney's fee on each party's standard of living." *Bowers v. Bowers,* 349 S.C. 85, 99, 561 S.E.2d 610, 617 (Ct.App.2002) (citing *E.D.M. v. T.A.M.,* 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992); *Heins v. Heins,* 344 S.C. 146, 160, 543 S.E.2d 224, 231 (Ct.App.2001)). "In determining the amount of attorney's fees to award, the court should consider: (1) the nature, extent, and difficulty of the services rendered; (2) the time necessarily devoted to the case; (3) counsel's professional standing; (4) the contingency of compensation; (5) the beneficial results obtained; and (6) the customary legal fees for similar services." *Id.* (citing *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991); *Shirley v. Shirley,* 342 S.C. 324, 341, 536 S.E.2d 427, 436 (Ct.App.2000)).

Here, the family court considered the proper factors in determining attorney's fees and gave a thorough explanation of its decision. Father argues litigation would have been

unnecessary had Mother followed their Settlement Agreement, but we disagree. The Settlement Agreement merely allowed for child support payments to be revisited annually and did not specifically require an automatic annual recalculation pursuant to the Child Support Guidelines. Because we affirm the family court's decision regarding the issues above, there has been no change in the outcome of the trial, and we find the preponderance of the evidence supports the family court. Accordingly, we affirm the family court.

CONCLUSION

For the foregoing reasons, the family court is

**AFFIRMED.**

FEW, C.J., concurs in separate opinion.

GEATHERS, J., concurs.

FEW, C.J., concurring:

I agree with the result reached by the majority to affirm the family court's decision to deny a reduction in child support payments. I disagree, however, with the majority's interpretation of the parties' settlement agreement. In my opinion, the phrase "Child support will be revisited on an annual basis" clearly and unambiguously indicates the parties intended that child support would be recalculated annually without the need for either party to demonstrate a substantial change in circumstances. *See Gaffney v. Gaffney*, 401 S.C. 216, 221–22, 736 S.E.2d 683, 686 (Ct.App.2012)("The interpretation of [marital litigation] agreements is a matter of contract law. When an agreement is clear on its face and unambiguous, the court's only function is to interpret its lawful meaning and the intent of the parties as found within the agreement." (citation omitted)). To that extent, I respectfully disagree with the majority.

In my opinion, however, the family court correctly denied the request to decrease child support. Even accepting the father's contention that his current income is close to zero, his income earning capacity is substantial. *See Marchant v. Marchant*, 390 S.C. 1, 9, 699 S.E.2d 708, 712–13 (Ct.App. 2010)("[T]he case law is clear that when a payor spouse seeks to reduce support obligations based on his diminished income,

a court should consider the payor spouse's earning capacity." (citation omitted)); *Spreeuw v. Barker*, 385 S.C. 45, 62, 682 S.E.2d 843, 851 (Ct.App.2009) ("[T]he common thread in cases where actual income versus earning capacity is at issue is that courts are to closely examine the payor's ... reasonable explanation for the decreased income." (citation omitted)). Moreover, while the father's new wife's income does not enter the analysis of child support, *see* S.C.Code Ann. Regs. 114–4720(A)(1) (2012) (defining "income as the actual gross income of the parent"), the fact that she is completely supporting him means he lives essentially expense free and has the ability to continue to support his children at the current level, even if his actual income has substantially decreased.